IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| VIOLET I. KISSEL, | ) | |
| | ) | 8:08CV513 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND ORDER |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner"). Violet Kissel ("Kissel") appeals a final determination of the Commissioner denying her application for Social Security benefits. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). On June 16, 2005, Kissel filed an application for Social Security Income ("SSI"), alleging disability beginning March 16, 1996. Filing No. 7 (no hyperlink available), Social Security Transcript ("Tr.") at 15. Kissel later amended her disability onset date to June 16, 2005. Tr. at 15. Kissel's claim is for Title XVI benefits only. Tr. at 271.

The Commissioner initially denied Kissel's claim on November 18, 2005, and upon reconsideration on January 5, 2006. Tr. at 15. On January 28, 2008, Kissel and a vocational expert ("VE"), Vanessa May, appeared and testified at a hearing before an Administrative Law Judge ("ALJ"). Tr. at 15. Kissel's non-attorney representative also appeared at the hearing. Tr. at 32, 271. The ALJ found that Kissel suffers from the following severe impairments: neck and back pain problems, asthma, allergies, arthritis, obesity, bilateral carpal tunnel syndrome and depression. Tr. at 24. On May 30, 2008, the ALJ concluded that Kissel had not been under a disability within the meaning of the Social

Security Act since June 16, 2005, the date her application was filed, and therefore denied her benefits. Tr. at 23. Kissel filed a request for review of the ALJ's decision before the Social Security Appeals Council ("Appeals Council") on June 9, 2008. Tr. at 11. On September 28, 2008, the Appeals Council denied Kissel's request for review. Tr. at 7. Kissel filed this action in the United States District Court for the District of Nebraska on November 11, 2008. Filing No. 1, Complaint.

## I. BACKGROUND

Kissel is currently 50 years old, but she was 49 years old at the time of the ALJ's and Appeals Council's decisions. Tr. at 5, 271. She was in special education classes throughout school and dropped out of high school in tenth grade, but she later obtained her GED. Tr. at 192, 291. She has a full-scale IQ of 81, and her mental ability is below average. Tr. at 221. She primarily worked as a certified nurse aide, but has not done so since 1986. Tr. at 192. She separated from her husband in 2001, and moved in with her adult daughter-in-law in 2005. Tr. at 56, 192.

Kissel reported that she experiences neck pain, right arm pain, back pain, bilateral knee pain, and left hip pain as a result of a 1997 car accident. Tr. at 18, 197. She also suffers from depression and anxiety. Tr. at 194. She is able to take care of her daily personal needs, but she reported that she has difficulty grabbing things with her hands and tends to drop things. Tr. at 72, 278. She finds it difficult to brush her hair, but has not seen a hand doctor for about five years due to lack of money and insurance. Tr. at 280. Kissel reported that she can only drive for about an hour, before stopping to rest. Tr. at 72. She goes to the store once a month. Tr. at 73. She reported that she takes frequent breaks

2

when doing household chores.  Tr. at 107.  Kissel lost her insurance in July of 2005, and does not have money to pay for medical care.  Tr. at 82.

On June 2, 2004, Kissel was treated at the University of Iowa Hospitals Family Care Clinic for asthma, depression, and chronic arthritic pain.  Tr. at 189.  The medical report for that date lists Dr. Paul A. James as the attending physician, and states that Kissel has smoked a pack of cigarettes per day for the past thirty years.  Tr. at 189.  Dr. James noted that Kissel has a history of alcohol abuse, but had not used alcohol for the previous year.  Tr. at 189.  The report noted that Kissel's depression was well-controlled by Lexapro and Wellbutrin, but Kissel had not been taking those medications for several weeks.  The report also indicated that Kissel was about five feet, three inches tall and weighed 218.9 pounds.  Tr. at 190.  Dr. James renewed Kissel's medications for arthritis, depression, and asthma, and advised Kissel about the importance of quitting smoking.  Tr. at 190.

Five months later, on November 3, 3004, Kissel returned to the Family Care Clinic, where Dr. Mark A. Graber administered medication refills, follow-up test results, and treated her for lower back pain.  Tr. at 177.  At that time, Kissel had been prescribed the following medications:  Tylenol Extra Strength for pain, Albuterol for breathing, Auralgan for a perforated eardrum, Celexa for depression, Cyclobenzaprine for muscle spasms, Flonase and Loratidine for allergies, Advair for Asthma, Furosemide for edema, Lovastatin for hyperlipidemia, and Protonix for gastroesophageal reflux disease.  Tr. at 177-78.  Dr. Graber's report from that day stated that Kissel's abdomen was obese and he described her insight and judgment as being poor to fair.  Tr. at 178.

On March 3, 2005, Kissel returned to the Family Care Clinic for hip pain and symptoms of bronchitis.  Tr. at 173.  Dr. Jason K. Wilbur was the attending physician for

3

this visit.  Tr. at 173.  Kissel reported that she continued to have depressive symptoms, but had been eating and sleeping well.  Tr. at 173.  The report stated that Kissel had not been able to quit smoking, and that, due to increased stress, she had been smoking two packs of cigarettes per day.  Tr. at 173.  Dr. Wilbur reported that Kissel's abdomen was obese, and that she had pain in her left and right hip areas during straight leg raises.  Tr. at 174.  Kissel complained of pain with external and internal hip and knee rotations, and could not flex her legs beyond a 45-degree angle.  Tr. at 174.

Kissel continued to receive treatment from the Family Care Clinic on 48 occasions between June 2, 2004, and April 27, 2005.  Tr. at 171, 189.  Dr. Elizabeth C. Clark was the attending physician for Kissel's last visit to the Family Care Clinic on April 27, 2005.  Tr. at 170.  Kissel arrived at the clinic complaining of left hip pain, neck pain, bilateral arm pain, and a sensation of clogged ears.  Tr. at 170.  Kissel stated she had been under increased stress because the friend she had been staying with said Kissel could not live with her anymore.  Tr. at 170.  Kissel reported that she continued to smoke a pack and a half of cigarettes per day.  Tr. at 170.  She said there had been times when she had gone out drinking, but that most of her heavy alcohol use had occurred more than four years ago.  Tr. at 170.  Dr. Clark reported that, Kissel was an "obese, 46-year-old, Caucasian female who appears distressed."  Tr. at 171.  Kissel described her mood as "very stressed out."  Tr. at 171.  Dr. Clark noted that Kissel had the following ailments:  hyperlipidemia, chronic pain, gastroesophageal reflux disease, depression, and chronic obstructive pulmonary disease.  Tr. at 171.  Kissel had continued to smoke and did not plan to quit.  Tr. at 171.

Dr. Eric J.  Rodrigo, a consultative physician, evaluated Kissel's physical condition on October 5, 2005.  Tr. at 196.  Kissel complained of asthma and multiple joint pains causing problems with walking, sitting, and riding.  Tr. at 196.  Kissel stated that the last

4

time she was in good health was 1997, before she injured her neck and back in a car accident.  Tr. at 196-97.  Kissel reported that she has had bilateral knee arthritis since childhood.  Kissel said her daily activities are limited due to hip and leg pain, and that over the past two months, her pain has averaged a 10 out of 10 level.  Tr. at 197.  Her typical day consisted of lying down, watching television, and occasionally watching her grandchildren.  Tr. at 197.  At that time, Kissel had been prescribed the following medications: Tylenol, Flonase, Cyclobenzaprine, Accolate, Citalopram, Advair, and an Albuteral inhaler.  Tr. at 198.

The "past medical history/past surgical history" section of Dr. Rodrigo's report lists the following: status-post total vaginal hysterectomy, bilateral salpingo-oophorectomy secondary to ovarian cyst, asthma, seasonal allergies, bilateral carpal tunnel syndrom, abdominal adhesions, lysis of adhesions, cervical spine fusion of C5 through C6 in 2000, lumbar spine and bilateral knee arthritis, depression, and a "pinched nerve" of the lower left extremity.  Tr. at 198.  Kissel had continued to smoke a pack of cigarettes per day, which she had done for the past thirty years.  Tr. at 198.  Kissel said she last worked as a certified nurse assistant in 1986, but was fired due to recurrent pneumonia, which she attributed to her asthma.  Tr. at 198.  Kissel said she would like to work again, but had not recently tried to find work.  Tr. at 198.  Dr. Rodrigo noted that Kissel suffered from depression, for which she took Celexa.  Tr. at 204.  Her affect was fair, and she was in a fair mental state.  Tr. at 203.

Dr. Rodrigo reported that Kissel had mild scoliosis and paraspinous muscle spasms of her lumbar spine.  Tr. at 202.  Dr. Rodrigo reported that Kissel had some difficulty walking on her heels and difficulty with tandem walking.  Tr. at 203.  Kissel had difficulty getting to and from the exam table and up and down from her chair.  Tr. at 204.  He found

Kissel had "obvious inspiratory and expiratory wheezes" on examination.  Tr. at 204.  He described Kissel's speech as, "articulate, fluent, and good content."  Tr. at 203.  Dr. Rodrigo reported that Kissel had the following health problems: chronic neck and lower back pain, limitations in range of motion in right shoulder, asthma, tobacco abuse, and epigastric pain.  Tr. at 203.  Dr. Rodrigo found that Kissel should be able to understand and carry out instructions, and respond appropriately to supervision, co-workers, and the normal work pressures in a work setting.  Tr. at 204.

Carolyn G. Sedlacek, Ph.D., a consultative psychologist, conducted a psychological evaluation of Kissel on August 26, 2005.  Tr. at 192.  Dr. Sedlacek noted that Kissel sighed frequently and appeared to be short of breath.  Tr. at 192.  Kissel "related a fairly talkative manner and was cooperative."  Tr. at 192.  Kissel told Dr. Sedlacek that she began working as a certified nurse aide when she was seventeen, but stopped when she could no longer lift patients.  Tr. at 192.  Kissel said that she had also worked as a security guard and at fast food restaurants.  Tr. at 192.  Kissel explained that "no one will hire her even though she has made numerous calls and filled out numerous applications."  Tr. at 192.  Kissel told Dr. Sedlacek that she had been hospitalized in the psychiatric unit of Mercy Hospital in 1981 or 1982 for a "nervous breakdown."  Tr. at 193.  Dr. Sedlacek noted that Kissel continued to smoke one pack of cigarettes daily.  Tr. at 193.  Kissel said her current medical problems were high cholesterol, heart murmur, asthma, and allergies.  Tr. at 193.  Kissel told Dr. Sedlacek that her left leg "tends to go out," and that, during the past few weeks, she had been crying frequently and staying in her room.  Tr. at 194.  Kissel said that she experiences anxiety when she leaves home, which causes her to become "real tense" and feel scared.  Tr. at 194.

Dr. Sedlacek found that Kissel's intellectual functioning appeared to be in the low average range. Tr. at 19. She assessed Kissel's GAF score to be in the 53-58 range, "suggesting no more than moderate symptoms." Tr. at 19. Dr. Sedlacek concluded that Kissel was capable of carrying out daily living activities and maintaining social functioning. Tr. at 195. She found that Kissel could carry out short and simple instructions under ordinary supervision, but she noted that Kissel might need some additional training at the beginning of carrying out instructions. Tr. at 195. Dr. Sedlacek found that Kissel "becomes stressed fairly easily, resulting in some withdrawal," but that she has the ability to relate to co-workers and manage her own funds. Tr. at 21. Dr. Sedlacek diagnosed Kissel with mild-to-moderate major depressive disorder, and adjustment disorder with mixed anxiety and depressed mood. Tr. at 195. She described Kissel's prognosis as fair. Tr. at 195.

On January 10, 2008, Beverly A. Doyle, Ph.D., treating psychologist, evaluated Kissel. Tr. at 219. Kissel told Dr. Doyle that she had taken Welbutrin to alleviate her depression since 1986, but she has not had money to buy the medication since 2003. Tr. at 220. Kissel cried during the evaluation and could not sit "for any period of time" because she was in constant pain. Tr. at 220. Dr. Doyle noted that Kissel stays in her bedroom most days and does not leave her house because she does not like to be around people. Tr. at 220. Dr. Doyle wrote that Kissel "has crying spells" that occur four to five times daily. Tr. at 223. Kissel has panic attacks three time a week, on average, and "she wishes she were dead" due to her pain, anxiety, and depression. Tr. at 220.

Using the Wechsler Adult Intelligence Scale–Third Edition, Dr. Doyle found that Kissel scored in the "average" level for the perceptual organization category, and the "low average" level for the verbal, performance, full scale, and verbal comprehension categories. Tr. at 221. Kissel scored in the "mentally deficient" level for the working

memory category, and received a "borderline" level score for perceptual speed.  Tr. at 221.
Kissel had a full scale IQ of 81, placing her in the 10th percentile.  Tr. at 221.  Dr. Doyle
diagnosed Kissel with dysthymic disorder, panic disorder with agoraphobia, a learning
disorder not otherwise specified, and assigned a GAF rating of 50, which suggests "serious
symptoms."  Tr. at 19, 221.  Dr. Doyle found that it would be difficult for Kissel to secure
or maintain employment due to her physical and psychological problems.  Tr. at 221.

In Dr. Doyle's Mental Residual Functional Capacity Assessment of Kissel, she found
that Kissel had "marked limitations" with respect to the following abilities:  dealing with work
stress, completing a normal workday and workweek without interruptions from
psychologically based symptoms, performing at a consistent pace without an unreasonable
number and length of rest periods, accepting instructions and responding appropriately to
criticism from supervisors or co-workers, and getting along with co-workers or peers without
distracting them or exhibiting behavioral extremes.  Tr. at 222.  The term "marked
limitation" means that Dr. Doyle found that Kissel has serious limitation in the above areas,
with a "substantial loss in the ability to effectively function."  Tr. at 222.  Dr. Doyle specified
that Kissel had "moderate limitations" in her ability to perform activities within a schedule,
maintain regular attendance, and be punctual with customary tolerances.  Tr. at 223.  A
"moderate limitation" means that Kissel has more than a slight limitation in the above area,
but she is still able to function satisfactorily.  Tr. at 222.  Dr. Doyle also noted that Kissel
would not be able to complete tasks in a timely manner, and that "even a minimal increase
in mental demands or change in environment" could cause Kissel to decompensate.  Tr.
at 224.  Dr. Doyle found that Kissel would be capable of handling Social Security disability
benefits if awarded them.  Tr. at 224.

On January 28, 2008, Kissel and the VE testified at a hearing before the ALJ.  Tr. at 15.  Kissel's non-attorney representative also appeared at the hearing.  Tr. at 32, 271.  Kissel testified that she has an arrangement with her daughter-in-law in which Kissel babysits for her grandchildren in exchange for rent.  Tr. at 192.  Kissel reported that she "sits at home" all day until she picks her grandchildren up from school.  Then, she watches her grandchildren until her daughter-in-law comes home from work.  Tr. at 282-84.  Kissel testified, among other things, that she has constant pain in her neck and shoulders, that her hands tend to go numb, and that she suffers from anxiety and depression.  Tr. at 278, 281-82.  Kissel testified that she has difficulty pronouncing "big words" and reading children's books.  Tr. at 277.  She also testified that she has problems with writing.  Tr. at 277.  For example, in a Daily Activities and Symptoms Report, Kissel wrote "it **take's** me about 2 minutes," and "my **arm's** go **nome** and **teangly**, my neck **hearts** [sic] . . . ."  (Emphasis added.)  Tr. at 73-74.

The ALJ asked the VE whether work would exist for a hypothetical individual with a residual functional capacity for sedentary, unskilled work, subject to multiple conditions, such as:

> There's no pushing or pulling of levers, either with the upper or lower extremities.  Bending, twisting, turning remains at occasional.  No crawling.  Stooping, squatting, climbing are occasional.   Kneeling is less than occasional but can be performed.  No use of air or heights.  No working in temperature extremes, cold, heat or humidity.  .  . same with dust, smoke, and fumes.  This individual would not be able to use her fingers or her wrists to type.  The ability to remember and carry out complex instructions is markedly limited . . . a marked inability to make judgments on complex work decisions.

Tr. at 296-297.  The VE testified that such a person could work as a call-out operator, DOT 237.367-014, or a government clerk, DOT 205.367-030.  Tr. at 294.

Kissel's representative asked the VE to consider a hypothetical individual identical to the person the ALJ described with the following addition limitation: an ability to carry out and remember unskilled work activities at 75% or less of the competitive rate.  Tr. at 295.  The VE stated that, with the additional limitation, no jobs would be available to such an individual on a full-time, competitive basis.  Tr. at 295.  The VE testified that the pace at which a job is done is of critical importance, even at the unskilled level.  Tr. at 295.

Six days after the hearing in front of the ALJ, on February 4, 2008, Julie Halsey, a Vocational Coordinator from Nishna Productions, Inc., conducted a one-day work evaluation of Kissel, which tested her work skills and productivity on a variety of job tasks.  Tr. at 233.  Kissel worked on eight jobs from 8:30 a.m. until 3:45 p.m., during which her productivity ranged from a low of 25% to a high of 75%.  Tr. at 235-38, 240.  Ms. Halsey wrote that Kissel looked like she was in pain throughout the day, and that Kissel needed to lift her left leg up as often as possible due to pain and swelling.  Ms. Halsey noted:

> [Kissel's] slower production rate and her difficulty sitting or standing for long periods of time due to pain may also be barriers to successfully competing in the open job market.

Tr. at 240.

The ALJ found that Kissel has not engaged in substantial gainful activity since June 16, 2005, the date her application was filed.  Tr. at 24.  The ALJ noted that Kissel has the following severe impairments:  neck and back problems, asthma, allergies, arthritis, obesity, bilateral carpal tunnel syndrome, and depression.  Tr. at 24.  The ALJ stated that Kissel does not have a combination of impairments that meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).  Tr. at 24.  The ALJ found that Kissel's depression does not cause marked limitations or one extreme limitation in the "B" criteria mental listings.  Tr. at 17.

He stated that Kissel's depression results in no more than mild-to-moderate limitations in activities of daily living, social functioning, concentration, persistence, or pace.  Tr. at 17.

The ALJ found that Kissel has the residual functional capacity to perform sedentary work, subject to the following conditions:

> no pushing or pulling with either upper or lower extremity, no more than occasional kneeling, no crawling, no typing, no rapid and repetitive flexion, extension, or side-to-side neck motion, no exposure to humidity or to extremes of cold or heat, no use of air or vibrating tools, no use of vehicles, no work at unprotected heights, no more than occasional exposure to dust, smoke or fumes, moderate limitations in interacting with the public, mild limitation in interactions with co-workers and supervisors provided the contact is brief, superficial, and related to job processes, and mild to moderate limitation in the ability to respond to changes in a usual, routine work setting.

Tr. at 17.

With respect to Kissel's emotional problems, the ALJ noted Kissel's testimony that she tends to cry for fifteen-minute to two-hour periods, up to six times per week.  Tr. at 20. The ALJ stated that Kissel does not socialize and experiences chest pain when her daughter-in-law has people over to the house.  Tr. at 20.  The ALJ found that Kissel's testimony concerning the intensity, persistence, and limiting effects of these symptoms was not credible because it was "inconsistent with the residual functional capacity assessment." Tr. at 20.  The ALJ noted that Kissel told Dr. Sedlacek that she cries frequently, has insomnia, and is afraid of being around a lot of people.  Tr. at 19.

The ALJ found that "with the exception of Dr. Doyle, State agency expert opinion was that [Kissel] could perform light work," subject to the above list of conditions.  Tr. at 21. The ALJ discounted Dr. Doyle's findings of multiple marked and moderate limitations as being inconsistent with the findings of Dr. Rodrigo and Dr. Sedlacek.  Tr. at 22.  The ALJ granted Dr. Doyle's opinion little weight:

> [It is] not consistent with the overall weight of evidence in the record, and, significantly, are based on [Kissel's] status after a long period without medication or other treatment, though [Kissel] had stated repeatedly in the past that various medications acted to lessen or to control her depressive symptoms.

Tr. at 22.

The ALJ found that Kissel has no past relevant work, and therefore job skill transferability was not an issue.  Tr. at 22.  He stated that Kissel was 46 years old when she filed her application, which would have made her a "younger individual" (age 45-49).  The ALJ noted that Kissel has a limited education and can communicate in English.  Tr. at 22.  The ALJ credited the VE's testimony, that "considering [Kissel's] age, education, work experience, and residual functional capacity," two jobs exist in significant numbers in the national economy that Kissel can do:  government clerk and call-out operator.  Tr. at 22-23.  The ALJ found, based on VE's testimony, that Kissel is capable of successful adjustment to work, and therefore is "not disabled."  Tr. at 23.  On May 30, 2008, the ALJ denied Kissel benefits.  Tr. at 23.

Kissel appealed the ALJ's decision.  Tr. at 7.  She submitted additional evidence to the Appeals Council, including a work evaluation and a report from VE, Alfred J.  Marchisio Jr.  Filing No. 18, Plaintiff's Brief ("Pl. Br.") at 11-12.  The record shows that the Appeals Council considered the following additional evidence:  medical records from Millard Chiropractic, vocational evaluation from Alfred J. Marchisio, and a letter of contention from Kissel's representative.  Tr. at 8.  Notably, the work evaluation is not mentioned.  *Id.*

Marchisio's report shows that the VE testimony at hearing before the ALJ was in error.  Tr. at 255-256.  Marchisio stated:

> There is not any such listing for "government clerk" in the DOT, 1991 Revision, or any of the DOT Supplements.  Clearly, anyone can review this listing and will not find any entry to "government clerk" or "clerk, government."

The specific citation was for "election clerk," DOT number 205.367-030. The VE assigning "government clerk" to this DOT number is in total error.

Tr. at 255-56.

Marchisio also stated that the job of an "election clerk" would not be full-time or consistent, since the job description reads, "[one] performs any combination of the following duties during elections." Tr. at 256. He noted that the job of an "election clerk" is sporadic and cannot even be labeled a seasonal occupation. Tr. at 256. He explained:

When the [ALJ] quotes on page ten, "pursuant to SSR 00-04p, the [VE's] testimony is consistent with the information contained in the [DOT]," this statement, in retrospect, is in error. The ALJ relied on the VE and did not receive proper guidance.

Tr. at 256.

The February 2, 2008, report from the work evaluation shows that Kissel's productivity rates for completing seven tasks, such as "labeling bags" and "cutting felt," ranged from 25% to 75%, at best. Tr. at 233-38. Kissel had a productivity rate of 0% for the eighth task of "breaking plastic pieces" because she "did not have the strength" to do it. Tr. at 236, 238.

On September 28, 2008, the Appeals Council denied Kissel's request for review of the ALJ's denial. Tr. at 7. Kissel argues, among other things, that the ALJ erred by improperly weighing the medical evidence of record and failing to develop the record. Pl. Br. at 9-19. Kissel argues that although the Appeals Council said it considered the additional evidence, it never mentioned the work evaluation. Kissel also argues that the Appeals Council erred by not properly considering new and material evidence, and in finding that there are jobs in the national economy that Kissel is capable of performing. Pl. Br. at 11-15.

13

## II. DISCUSSION

### A. Law

When reviewing a Social Security disability benefits decision, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole. *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support a decision." *Cox v. Apfel*, 160 F.3d 1203, 1206-07 (8th Cir. 1998). In determining whether the evidence in the record is substantial, the court must consider "evidence that detracts from the [Commissioner's] decision as well as evidence that supports it." *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a) (1998); *Cox*, 160 F.3d at 1206. Under the Commissioner's regulations, the determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity ("RFC") and his or her age, education and work experience. 20 C.F.R. § 404.1520(a); *Flannery v. Chater,* 112 F.3d 346, 349 (8th Cir. 1997). The Commissioner determines: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment–one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and

(5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. *Cox*, 160 F.3d at 1206.

For judicial review of the denial of Social Security benefits, an error is harmless when the outcome of the case would be unchanged even if the error had not occurred. *See Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003)*. A VE's testimony may be considered substantial evidence "only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." *Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997)* (*citing Porch v. Chater, 115 F.3d 567, 572-73 (8th Cir. 1997)*, *and Pickney v. Chater, 96 F.3d 294, 297 (8th Cir. 1996)*).

"[A] treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000)* (*quoting* 20 C.F.R. § 404.1527(d)(2) (2006)). An ALJ cannot substitute his opinion for the medical opinions. *Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990)*. The ALJ has a duty to fully and fairly develop the administrative record. *Smith v. Barhhart, 435 F. 3d 926, 930 (8th Cir. 2006)*.

### B. Analysis

After careful review of the record, the court finds that the evidence presented to the Appeals Council shows that the VE at the hearing erred in stating that Kissel could perform the job of a "government clerk." Kissel has shown that the job does not exist in the national economy. Even if the job of an "election clerk" were considered instead, it would not

qualify as consistent or full-time employment.  The job of a "call-out operator" requires a skill level of 3 for "reasoning development" and "language development," and a skill level of 2 for "mathematical development." United States Dep't of Labor, Employment, and Training Admin., *Dictionary of Occupational Titles* ("DOT"), § 237.367-014.  An individual who has a skill level of 3 for "language development" and "reasoning development" can:

> Apply common sense understanding to carry out instructions furnished in written, oral, or diagrammatic form. . . . Deal with problems involving several concrete variables in or from standardized situations. . . .  Read a variety of novels, magazines, atlases, and encyclopedias. . . . Write reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech. . . . Speak before an audience with poise, voice control, and confidence.  . .

DOT, § 237.367-014.

Further, the court finds error in the ALJ's finding that Kissel could perform the functions of a "call-out operator."  Although the "call-out operator" job may be unskilled, sedentary work, the record shows its mental skill level requirements far exceed Kissel's abilities.  The record shows that Kissel's judgment and insight are fair to poor, and her communication skills are lacking.  Kissel has a Full-Scale IQ score of 81, and she scored in the 1st percentile or "mentally deficient" level for "working memory" on the Wechsler Adult Intelligence Scale–Third Edition.  Furthermore, at the hearing, the VE testified that the job of a "call-out operator" would not be available to Kissel on a full-time, competitive basis if her productivity rate were below 75% of the competitive rate.  The work evaluation later submitted to the Appeals Council showed that Kissel's productivity was below 75%, and at times was between 0-25%.  Given Kissel's low productivity rate, there is no substantial evidence in the record to support the ALJ's conclusion that Kissel is able to perform the functions of a "call-out operator" on a full-time basis.

The court also finds that the ALJ erred in crediting the opinion of consulting psychologist favoring Dr. Sedlacek over the opinion of Dr. Doyle. Dr. Sedlacek and Dr. Doyle are both psychologists, whereas Dr. Rodrigo is a medical doctor. Dr. Sedlacek and Dr. Rodrigo saw Kissel in 2005, and they both found that she was capable of working. Tr. at 195, 204. Dr. Doyle saw Kissel in 2008 and found that it would be difficult for Kissel to secure employment because of her physical and psychological problems. When Dr. Sedlacek met with Kissel, she only conducted a psychological interview. However, when Dr. Doyle saw Kissel, she interviewed Kissel, administered a full IQ test, and completed a Mental Residual Capacity Assessment, through which she found Kissel had marked limitations in multiple areas.

The ALJ afforded significant weight to Dr. Sedlacek's opinion simply because it was similar to Dr. Rodrigo's opinion. "Based on all records in file, with the single exception of the report of Dr. Doyle, State agency expert opinion was that the claimant could perform light work . . . ." Tr. at 21. The only "records in file" that the ALJ refers to in his report are those of the three professionals discussed above. Dr. Rodrigo's medical opinion regarding Kissel's physical condition has little to do with Dr. Sedlacek's opinion about Kissel's psychological health. Furthermore, the court finds that Dr. Doyle's opinion is consistent with Dr. Sedlacek's opinion. Both psychologists diagnosed Kissel with depression and anxiety disorders, and both psychologists recognized that Kissel's intellectual functioning ability is in the low average range.

The record reflects that Dr. Sedlacek and Dr. Doyle were the only psychologists to ever meet and speak with Kissel since her alleged onset date. If Dr. Sedlacek never completed a Mental Residual Capacity Assessment of Kissel, and Dr. Rodrigo only saw Kissel for physical ailments, then it makes little sense for the ALJ to have found that Dr.

Doyle's opinion is inconsistent with the "weight of evidence in the record." The court finds that the ALJ erred in discounting Dr. Doyle's opinion. Furthermore, if the ALJ thought Dr. Doyle's 2008 opinion was inconsistent with Dr. Sedlacek's opinion from 2005, then he had a responsibility to develop the record, and has apparently failed to do so.

The court finds that Kissel is disabled. Considering the record, including Kissel's limited education, testimony at hearing, Full-Scale IQ score, and scores from the Mental Residual Functional Capacity Assessment, as well as the additional evidence offered to the Appeals Council, the court finds that the Commissioner has not sustained his burden to show that there are jobs that exist in significant numbers in the national economy that Kissel can perform. Thus, because the record presented to the ALJ and the Appeals Council contains substantial evidence supporting a finding of disability, the court may reverse the case for entry of an order granting benefits to the claimant. *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir. 1984). "Where the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate." *Thompson v. Sullivan,* 957 F.2d 611, 614 (8th Cir. 1992). In this case, the substantial evidence supporting a finding of disability is overwhelming. Under the circumstances, further hearings would merely delay benefits; therefore, an order granting benefits is appropriate. *Id.*

THEREFORE, IT IS ORDERED:

1. The findings and conclusions of the ALJ are reversed and benefits are awarded. This cause is remanded to the Commissioner for computation and payment of benefits.

2. A separate judgment shall be entered in conjunction with this Memorandum and Order.

3. The plaintiff shall have fourteen days from the date of this order to file a motion and brief with appropriate documentation requesting attorney fees in this case. Defendant shall have fourteen days after plaintiff files her motion in which to file a response.

DATED this 20th day of August, 2009

BY THE COURT:

s/ Joseph F. Bataillon
Chief District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.